**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ERIC K. GILL** <br> 4711 Marymead Drive <br> Fairfax, Virginia 22030 <br><br> **Plaintiff,** <br> v. <br><br> **AMERICAN INSTITUTES FOR RESEARCH** <br> 1000 Thomas Jefferson Street, NW, <br> Washington, DC 20007 <br><br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) **CASE NO. _____** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## AMENDED COMPLAINT

### NATURE OF THE ACTION

1. This is an action for declaratory, monetary and equitable relief brought by Plaintiff **Eric K. Gill** under the Family and Medical Leave Act of 1993, 29 C.F.R. §825 *et seq.*, (hereinafter "FMLA" or "Act") to compensate Plaintiff for violations occurring under the Act as well as retaliatory treatment suffered by Plaintiff on account of his availing leave under the Act, and to provide other appropriate relief to Plaintiff who was adversely affected by such violations.

### JURISDICTION AND VENUE

2. Jurisdiction of this Court is invoked pursuant to Section 107 (a)(2) of the FMLA, 29 C.F.R. §825.410, which provides for the institution of a civil action for damages and equitable relief against an employer by an employee, in any federal or state court of competent jurisdiction.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1331. Defendant conducts business in the District of Columbia and is thus subject to the jurisdiction of this Court.

4. A portion of the violations of the FMLA alleged to be unlawful as well as the retaliation suffered by Plaintiff for activities connected with the assertion of rights under the FMLA were committed in this District and thus fall within the jurisdiction of this Court.

## PARTIES

5. Plaintiff is a 45-year-old, male citizen of the United States of America. He currently resides in and has been a resident of the Commonwealth of Virginia since September 2005.

6. Plaintiff is a covered, eligible employee under Section 101 (2)(A) and 101 (2)(B) of the FMLA, 29 C.F.R. § 825.110, having worked for Defendant for at least twelve months and at least 1,250 hours during the preceding 12-month period prior to his taking FMLA leave.

7. At all relevant times, Defendant American Institutes for Research (hereinafter "AIR"), has been a company headquartered in the District of Columbia, and continuously conducting business in the District of Columbia, as well as other jurisdictions, and has continuously had at least 50 employees.

8. Defendant is a covered employer under Section 101 (4)(A)(i) of the FMLA, 29 C.F.R. § 825.105(b), being engaged in commerce or an industry affecting commerce, and employing 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

**STATEMENT OF FACTS**

9. Plaintiff had enjoyed a long and distinguished career as a professional editor, with more than 20 years of experience, when he began employment with the Defendant, American Institutes for Research (AIR), on March 3, 2003.

10. Plaintiff was initially employed at AIR's regional office in Sacramento, California, as a Level-4 Editor in the Assessment department, which produces and administers state K–12 testing under federally mandated provisions of the No Child Left Behind Act. He subsequently requested and accepted a transfer to AIR's Washington, D.C., headquarters, which took effect in September 2005.

11. During his tenure at AIR, Plaintiff endured a hostile work environment, with several instances of harassing and discriminatory treatment based primarily on his age and gender, and later based on his disability caused by a serious accident to his left hand.

12. These statutory violations by Defendant of Plaintiff's civil rights and his rights under state and federal equal employment opportunity laws, as well as equal pay laws, are the subjects of charges filed before the Equal Employment Opportunity Commission, Washington, D.C. field office on April 26, 2006.

13. In April 2005, Plaintiff was called into a teleconference meeting with a D.C.-based senior manager to discuss who was to blame for an error on certain client deliverables. At the conclusion of the meeting, Plaintiff's Sacramento-based supervisor Ms. Elizabeth Durkin declared to Plaintiff, "They're looking to fire someone." This led Plaintiff to believe his job was in serious jeopardy if he

remained in Sacramento, and prompted him to request a transfer to AIR's Washington, D.C. offices.

14. Around the months of May and June 2005, Plaintiff suffered much emotional duress and anguish, partly due to the hostile environment and toxic work atmosphere and partly due to the uncertainty prevailing over whether the Sacramento office would be shut down. Added to this was the pressure of not knowing why his application for a transfer to the Washington, D.C., headquarters was delayed without explanation, and prompting concern that the transfer had been rejected, despite a verbal commitment from a senior manager in May 2005.

15. In the midst of this emotionally turbulent time, Plaintiff suffered an accident on June 4, 2005, while using an electric table saw. Plaintiff had to be rushed via helicopter to a micro-surgery and amputee hospital in San Francisco, where emergency surgery was performed on his left hand. The accident resulted in the amputation of his left index finger, the mangling of his middle finger, the near severing of his little finger, permanent damage to his ring finger, and the tip of his thumb being cut off.

16. Based on medical advice, Plaintiff sought medical leave under the FMLA from June 6, 2005, to June 26, 2005.

17. By means of the Family Leave Health Care Provider Certification, Plaintiff's medical doctor advised that Plaintiff could participate in a "modified" work schedule starting June 27, 2005, until July 31, 2005, during which time Plaintiff would only be permitted to work 4 hours a day, and specifying that his use of a

computer keyboard was also to be limited to 4 hours per day[1]. If the Defendant were unable to provide Plaintiff with this accommodation, then his doctor advised that Plaintiff should not work for the duration of this period.

18. However, in utter disregard for these medical directives, Plaintiff's supervisor Mr. Dan Parham and another colleague sent emails to Plaintiff asking him to undertake and perform editing assignments when he should have been recuperating after his amputation surgery.

19. In fear of losing his job, because the closing of the Sacramento office seemed imminent[2], and because he had not yet received any written confirmation of his transfer to the Washington, D.C., office, Plaintiff, while on FMLA leave, felt compelled to continue working immediately after the amputation of his left index finger, the placement of pins in his middle finger, a tendon graft to his little finger, and stitches in his ring finger.

20. This unreasonable workload exacerbated the frequency of Plaintiff's pain and necessitated the increased use of medication to alleviate that pain. During this period, from June 6 through July 31, Plaintiff was also undergoing intense weekly physical therapy sessions to prevent atrophy of his left-hand fingers.

21. On June 15, 2005, ten days after Plaintiff's accident and approximately two months after submitting his initial request for a transfer, Plaintiff received from HR representative Ms. Estela DeOliveira written confirmation of his transfer to AIR's Washington, D.C., headquarters. Plaintiff requested that senior management make

---

[1] The nature of Plaintiff's work as an Editor requires that he constantly view and edit documents. A majority of such editing is done with the aid of a computer, which necessitates the usage of typing on a computer keyboard for long durations of time.

[2] Plaintiff received several repeated emails from colleagues in Sacramento and Washington D.C. informing him that the Sacramento office would likely be closing down.

   an announcement of his transfer so that his Sacramento-based managers might cease pressure on him to work longer hours than instructed by Plaintiff's physician. However this request was delayed for several weeks and Plaintiff continued to receive work assignments that required him to work long hours.

22. Therefore, despite instructions from Plaintiff's doctor stating that he should be given a modified work schedule consisting of no more than 4 hours per day, Plaintiff found that Defendant disregarded this medical instruction. Certain Sacramento- and Washington D.C.-based staff pressured Plaintiff into completing assignments with deadlines that required him to work six to eight hours per day contrary to Plaintiff's doctor's instructions.

23. This pressure was compounded by the information provided in writing by Plaintiff's colleagues informing him that the stepped-up deadline pressure was reportedly motivated by Sacramento management's attempt to replace Plaintiff with a full-time editor. The pressure was further compounded by the hiring of a full-time proofreader in Sacramento and two full-time editors in Washington, D.C.

24. Thus, despite his doctor's directive, Plaintiff was required to work more than four hours per day in order to complete his assignments on schedule. This led Plaintiff to contact his doctor's office for advice on June 30, 2005, and upon the instructions of his orthopedic surgeon, to take full medical leave under the FMLA from July 1 to July 31, 2006.

25. Plaintiff reported for work in Washington D.C. on September 19, 2005. Merely two weeks into his new assignment in Washington, D.C., Plaintiff found that he had begun working overtime on a routine daily basis, in spite of the fact that his hand

6

had not completely healed. On one such occasion, when Plaintiff attempted to leave the office at 10:15 p.m., he was approached by a project director, who instructed him to remain and continue working. Plaintiff complied with this demand, and continued working until approximately 11:30 p.m.

26. The work atmosphere at AIR became more hostile and unbearable, and Plaintiff began experiencing even greater stress, compounded by his injured hand, which was still causing him pain due to the overload of work assignments that Plaintiff was required to undertake on an overtime basis.

27. As a result of Defendant's abject disregard for Plaintiff's medical needs and the lack of accommodation provided to him on the job for his hand injury, Plaintiff felt overwhelmed by his circumstances. He began to experience severe stress reactions manifested by his lack of concentration, inability to sleep at night, low energy level, and an overwhelming sense of fear and anxiety.

28. In late October 2005, Plaintiff took approximately three days off from work in order to fly back to California for a final visit with his orthopedic surgeon, who informed Plaintiff that the pain he was still experiencing in his amputated finger would likely continue for 12 to 18 months after the time of his accident. Plaintiff took Personal Time Off (PTO) for this medical leave trip to California because he was not aware he still had more than 230 hours remaining under AIR's short-term disability insurance Wage Replacement program.

29. Finally, in February and March 2006, Plaintiff visited his Virginia-based primary physician, who stated that Plaintiff had not been afforded the opportunity to fully recover from his hand injury, and referred Plaintiff to psychological counseling in

reference to his accident and hand injury, and subsequent work-related stress. In the same doctor's note dated March 27, 2006, she instructed Plaintiff to take a "reprieve" from work from March 28, 2006, to April 10, 2006. Therefore, Plaintiff once again went on FMLA leave, having been made aware that he had 231 hours of remaining Wage Replacement benefits.

30. However, in spite of these specific instructions from Plaintiff's doctor advising that Plaintiff be placed on medical leave, Plaintiff continued to receive work-related inquiries from the Washington, D.C. office, which compelled Plaintiff to return to work because he feared that he would lose his job if he remained on medical leave.

31. Upon Plaintiff's return to work on April 11, 2006 it came to his attention that Ms. Holly Baker sent an email — while Plaintiff was on leave under the FMLA — to other colleagues announcing that Plaintiff had been "permanently replaced" as the Editor on a project that was reportedly not performing up to expectations and allegedly was $1-million over budget. Ms. Baker sent this email knowing it was an erroneous statement; in fact, she was the Lead Editor for that particular contract.

32. Around the same time, Plaintiff was made aware of another email sent by Ms. Baker, again while Plaintiff was on FMLA leave, authorizing the use of a recent college graduate, Ms. Laura Honzay, to sign off on test forms despite prior contrary instructions from Plaintiff and the department director, as well as Ms. Baker's own directive in January 2006, that Ms. Honzay was a Research Assistant, was not qualified to act as an editor, and was to "have no role in the QC process."

33. It appeared that obvious efforts were being made to undermine Plaintiff and replace him.

34. Upon his return to work after FMLA leave on April 11, 2006, Plaintiff filed an internal grievance against Ms. Baker for her conduct in sending out an embarrassing and damaging email that reflected inaccurate information about Plaintiff.

35. Two days later, on April 13, 2006, Plaintiff was informed in an email by Mr. Parham that in reference to the "Ohio project," all work would be coordinated and allocated by Ms. Baker.

36. That same day (i.e., April 13, 2006), Plaintiff met with HR representative Mr. Jeff Mike to discuss his grievance. Immediately, an intimidating and threatening tone was set for this meeting. One of the first statements made by Mr. Mike to Plaintiff at this meeting, was that another editor was being hired at the D.C. office.

37. Additionally, instead of his grievance being processed and taken seriously, Plaintiff was informed that Ms. Baker was "highly regarded by management" and that a possible outcome of proceeding with a grievance against her might call into question Plaintiff's own work quality.

38. Plaintiff perceived this statement by the HR department as a veiled warning affecting his continued employment with the Defendant, and thus that same day (April 13, 2006) he withdrew his complaint against Ms. Baker for fear of losing his job.

39. The very next day (i.e., April 14, 2006), in a patently retaliatory act, Plaintiff's supervisor, Mr. Parham, met with Plaintiff and informed him that the quality of his work on a small portion of a recent Ohio-related editing assignment was being called into question after Ms. Baker allegedly had found some errors in his work. This was highly unusual because Defendant's general procedures did not allow for

the writing-up of a fellow editor, and the manner in which that particular assignment was coordinated did not accommodate the standard practice of having a second editor "read behind" Plaintiff's work, as per Ms. Baker's own written editorial procedures, as well as recent assignments in which Plaintiff was asked to read behind Ms. Baker's work to ensure accuracy prior to delivery of documents.

40. At this same meeting, and in what appeared to be a further retaliatory act, Mr. Parham pulled Plaintiff off of all Assessment contracts except for the two South Carolina projects, which were near completion, thereby diminishing Plaintiff's potential billable hours by 25 percent during a given pay period and causing Plaintiff concern that his job would soon be eliminated.

41. That same day (i.e., April 14, 2006), Plaintiff received an email from Mr. Parham recapitulating the discussion held previously wherein Plaintiff had been reprimanded for the quality of his work, noting several "issues" with Plaintiff's recent assignment and recording the reassignment or rescinding of Plaintiff's tasks. Plaintiff was also informed that he would be placed on a work improvement program, confirming Plaintiff's belief that he had been officially reprimanded in writing.

42. On April 21, 2006, Plaintiff called in sick via email and also informed his supervisors that he had two doctors' appointments the following Monday, April 24, both of which were related to his hand injury. Plaintiff also informed his supervisor that he would be seeking psychological therapy.

43. Less than a month after advising Plaintiff to take leave from work, his doctor, through a note dated April 24, 2006, once again advised Plaintiff to request a

"reprieve from work" from April 24, 2006, to May 17, 2006, due to work-related stress.

44. That same day (i.e., April 24, 2006), while Plaintiff was on FMLA medical leave, AIR posted on its corporate website, and later through advertisements on the Washingtonpost.com and Monster.com job sites, an opening for an Assessment Senior Editor position with experience and qualification requirements identical to that of Plaintiff's own including ten-plus years of copyediting experience.

45. Because AIR's internal titles list specifies Senior Editor as a Level-5 position, Plaintiff applied for the job via AIR's website. A few weeks later, Plaintiff informed his supervisor that he had applied for the position, but was told it was a Level-4 job, identical to Plaintiff's. This confirmed Plaintiff's apprehension that it was, in fact, his own position that was being advertised.

46. On May 31, 2006, per AIR's employee manual, Plaintiff filed an official protest of the written reprimand and the unfair removal of him from his assigned tasks.

47. On June 1, 2006, the very day that Plaintiff returned to work from FMLA leave, Mr. Parham informed Plaintiff via email that "multiple eyes" would now be reviewing his work. Plaintiff considered this to be a clear demotion because as Lead Editor for the two primary and aging South Carolina contracts, Plaintiff was previously the "last line of defense" and had final editorial sign-off on all client deliverables for these contracts. Plaintiff later discovered that another AIR editor, Ms. Caroline Barnes, had been transferred to the Assessment department to replace him as the final "sign-off" editor on those documents, despite the fact that Plaintiff had considerably more Assessment-related editing experience than did Ms. Barnes.

48. This situation caused further anxiety and stress to Plaintiff, who had to undergo a complete physical examination due to sudden weight loss and a severe sleeping disorder. Plaintiff also complained of recent chest pains, prompting his physician to instruct her nurse to conduct an EKG test. That evening, Plaintiff's general physician phoned Plaintiff and instructed him to make an appointment with a cardiologist the following day due to what she described as an abnormal EKG reading. The following day, Plaintiff went to a cardiologist upon his physician's advice and was diagnosed with "left bundle branch block" and told that he would eventually require a pacemaker. Plaintiff then underwent a series of tests over the ensuing two weeks to determine the immediate severity of the diagnosis.

49. Once again, upon consulting his general physician during a follow-up visit, Plaintiff was advised to go on medical leave from June 5, 2006, to June 19, 2006, thereby exhausting all remaining FMLA-protected leave hours. Plaintiff notified his supervisor and HR representative of his recent diagnosis and requested permission to take unpaid leave. Therefore, this situation now forced Plaintiff to take unpaid personal time off, and compelled him to return to work prematurely.

50. Upon his return to work on June 20, 2006, Plaintiff was instructed by Mr. Parham to report to Ms. Baker for copyediting assignments. Ms. Baker told Plaintiff that Ms. Barnes was now a full-time Level-5 Senior Editor for the Assessment department and informed Plaintiff that another editor had been hired while Plaintiff was on FMLA-protected leave.

51. Because of his supervisor's recent reprimand and Plaintiff's demotion and replacement as Lead Editor for the two primary South Carolina projects and

because HR never responded to Plaintiff's application for the Senior Editor posting, Plaintiff was convinced he had been replaced by the newly hired editor, and that he was being set up to be fired in short order.

52. Unable to endure the constant harassing treatment and written reproaches, and fearful about the rescission of his billable work on the Ohio contract and the peculiar absence of assignments on a new Hawaii contract, as well as the removal of his vital job responsibilities as Lead Editor for two South Carolina contracts and seriously concerned about his emotional and physical well-being ─ compounded by the several FMLA violations to which he had been subjected ─ Plaintiff felt forced into submitting his letter of resignation on June 20, 2006, with an effective end date of July 10, 2006.

## STATEMENT OF CLAIMS

### COUNT I
### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT
### 29 C.F.R. § 825 *et seq.*

53. Plaintiff reiterates the allegations contained in paragraphs 1 through 52 and incorporates the same by reference as though they were fully set forth herein.

54. Defendant AIR, through the conduct of its officers, agents, and employees, including, but not limited to, Ms. Holly Baker, Mr. Dan Parham, and Mr. Jeff Mike, subjected Plaintiff to a continuing course of conduct which violated and deprived Plaintiff of his federally protected rights under the Family and Medical Leave Act:

   a. By disregarding Plaintiff's doctors recommendations to place him on leave under FMLA, by continuing to pressure Plaintiff to

        report to work and undertake work assignments during his scheduled FMLA leave;

    b.    By disregarding Plaintiff's doctors instructions to place Plaintiff on a modified work schedule of 4 hours per day, and instead requiring Plaintiff to work complete work days and even overtime and weekend assignments soon after returning from FMLA leave;

    c.    By undermining Plaintiff's job duties and responsibilities, and removing Plaintiff from assignments that he had been handling as lead editor prior to going on FMLA leave, by effectively ignoring Plaintiff's written protest of his supervisor's reprimand, and assigning vital tasks to much junior and inexperienced staff;

    d.    By effectively demoting Plaintiff from his position, on his return from FMLA leave, by ordering him to report to Ms. Baker and by promoting Ms. Barnes to Assessment as a Level-5 Senior Editor while Plaintiff was on FMLA leave, a position for which Plaintiff had applied but never received an acknowledgment from personnel.

55. As a direct and proximate consequence of Defendant's actions described herein, Plaintiff has been and continues to be deprived of his rights; has suffered loss of income, wages and benefits, and employment opportunities; has suffered other monetary damages, and physical and psychological injury, stress, anxiety, and distress.

56. Defendant's actions were done with malice or with reckless indifference to the federally protected rights of Plaintiff.

## COUNT II
## RETALIATION FOR AVAILING THE FAMILY AND MEDICAL LEAVE ACT
## 29 C.F.R. § 825 *et seq.*

57. Plaintiff reiterates the allegations of Paragraphs 1 through 52, and incorporates them by reference herein.

58. Plaintiff engaged in activity protected under FMLA when he asked for and took leave from work based on the medical advice of his treating physicians.

59. Defendant retaliated against Plaintiff for such protected activity; specifically:

   a. By subjecting Plaintiff to harassing conduct, *inter alia,* by Ms. Holly Baker and Mr. Dan Parham in that false allegations and disparaging and derogatory statements about his capabilities and skills were publicly made while he was on FMLA-protected leave;

   b. By refusing to act on his grievances on his return from FMLA-protected leave, and instead intimidating him into withdrawing his grievance by threatening adverse action against his own work and effectively ignoring Plaintiff's written protest of his supervisor's reprimand;

   c. By rescinding major projects previously assigned to Plaintiff as

    lead editor, and reducing his responsibilities as Lead Editor on his return from FMLA-protected leave;

  d. By placing disparate and unequal work requisites upon Plaintiff after he returned from FMLA protected leave, such as by giving him unfamiliar assignments with impossible deadlines to meet;

  e. By reprimanding Plaintiff verbally and in writing for the allegedly poor quality of his recent editing work;

  f. By openly advertising Plaintiff's position in a job announcement and hiring Ms. Barnes as a Level-5 Senior Editor during Plaintiff's absence while on FMLA-protected leave.

60. Defendant had actual and constructive notice of the unlawful treatment of Plaintiff while he was supposed to be on scheduled FMLA leave, and failed to take reasonable corrective action or action reasonably calculated to prevent said violations from reoccurring. Although Plaintiff made several complaints to management, no prompt or remedial action was taken, thus making Defendant liable and responsible for the actions of its supervisors.

61. As a direct and proximate consequence of Defendant's actions described herein, Plaintiff has been and continues to be deprived of his rights, suffered loss of income, wages and benefits, and employment opportunities, other monetary damages, and physical and psychological injury, stress, anxiety, and distress.

62. Further, Defendant's actions were done with malice or with reckless indifference to the federally protected rights of Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Eric K. Gill, respectfully requests that he be accorded the following relief against Defendant:

(A)     That a declaratory judgment be entered finding Defendant's acts and employment practices unlawful and violative of the Family Medical and Leave Act, and that Defendant be enjoined from engaging in such unlawful acts and practices;

(B)     That an order be issued for lost wages, benefits and compensation due, including interest thereon, with an actual amount to be proven at trial;

(C)     That Plaintiff be compensated for the unpaid sick leave utilized by him on account of the Defendant's unlawful employment practices, with an actual amount to be proven at trial;

(D)     That Plaintiff be compensated for medical, psychiatric, and other related expenses incurred by him on account of the Defendant's unlawful employment practices, with an actual amount to be proven at trial;

(E)     That Plaintiff be compensated for his physical, psychological, and emotional harm, with an actual amount to be proven at trial;

(F)     That Plaintiff be compensated for past and future pecuniary and non-pecuniary losses resulting from the Defendant's unlawful practices, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial, with an actual amount to be proven at trial;

(G)     That judgment be entered for the costs of this suit and the reasonable attorney's fees; and

(H)     That Court grant such other and further relief be granted as deemed necessary and appropriate to remedy the unlawful employment practices complained of herein.

Respectfully submitted,

_____
Michael J. Beattie, Esquire (Bar# 450873)
EMPLOYEE RIGHTS LAW GROUP
9502 Lee Highway, Suite B,
Fairfax, Virginia  22031.
Telephone: (703) 273-2235
Facsimile: (703) 273-3440
COUNSEL FOR PLAINTIFF